Filed 10/28/15  P. v. Abbott CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DAVID BRIAN ABBOTT,<br><br>     Defendant and Appellant. | B258086<br><br>(Los Angeles County<br>Super. Ct. No. YA083184) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Eric C. Taylor, Judge.  Affirmed.

Richard M. Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell, Nathan Guttman, and Steve Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant David Brian Abbott (defendant) appeals from his conviction of voluntary manslaughter. He contends that the trial court erred in failing to instruct the jury as to involuntary manslaughter in general, and as to involuntary manslaughter based upon unconsciousness caused by voluntary intoxication. Defendant further contends that defense counsel rendered ineffective assistance by not requesting the instructions. Finding no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

Defendant was charged with the murder of Samantha Sproson (Sproson), in violation of Penal Code section 187, subdivision (a).[1] The information further alleged that defendant personally and intentionally discharged a firearm causing death, within the meaning of section 12022.53, subdivision (d). A jury found defendant not guilty of murder but guilty of the lesser included offense of voluntary manslaughter in violation of section 192, subdivision (a), and found true the firearm allegation.

On July 31, 2014, the trial court sentenced defendant to a total term of 15 years in prison, comprised of the upper term of 11 years, plus the middle term of four years for the firearm enhancement. The court ordered defendant to pay mandatory fines and fees, and awarded total presentence custody credit of 1,083 days. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Sproson died of a single gunshot wound to the back of the head inflicted by defendant on December 31, 2011.

Defendant's neighbor Michael Tapp (Tapp) testified that he was awakened by defendant's voice in Sproson's apartment around 5:00 a.m. on the morning of the shooting. Sproson lived next door, and they shared a common wall which did not keep out sound very well. Defendant was saying, "I want my clip,"[2] which he repeated numerous times. Finally, defendant said, "Give me the clip, or I'm going to shoot you. I

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     An ammunition magazine is sometimes called a "clip."

2

still have one in the chamber." Defendant then counted down from 10 to one. When he reached one, Tapp heard footsteps going toward the back of Sproson' apartment. When Sproson said she did not have the clip, defendant demanded it again and then counted down from three. About 30 seconds later, Tapp heard a pop like a firecracker, and called 911. Tapp heard a rustling sound on the hardwood floors, but no more voices.

Defendant lived in the same apartment complex as Tapp for about two years. They socialized with other neighbors 10 or 12 times, and on such occasions defendant usually drank alcohol. Once when defendant was with friends, Tapp observed that defendant was so intoxicated he was unable to walk straight on his own and was stumbling from side to side. Defendant's friends virtually dragged him to the local bar. On another occasion, Tapp observed defendant talking to the landlord while he appeared to be intoxicated. Defendant's speech was slurred and he kept repeating himself. Tapp testified that defendant's speech did not seem slurred at the time he heard defendant demanding the clip.

Sandy Marino (Marino), also lived in the same building. She testified that Sproson was her friend, that she had introduced her to defendant, and that she regularly socialized with defendant and Sproson. Defendant, whose nickname was "Drunk Dave," drank a lot, almost every day, and often became so intoxicated he would lose his balance, his speech would become slurred, and he would pass out. Marino testified that Sproson was usually in defendant's apartment, where there were often parties and fights between defendant and Sproson, some of them physical. Sproson drank an average amount, not a lot. Once Marino saw defendant drag Sproson down the stairs by the nape of her neck and once saw him trying to "choke her out" by placing his arm around Sproson's neck in a headlock Sproson did not appear to be physically injured.

Within a minute or two after Tapp's 911 call, two Hermosa Beach police officers arrived and found defendant standing in the hall outside Sproson's apartment (No. 6). One of them, Officer Mark Smuts, testified that he saw defendant who appeared to be very intoxicated, but with fine coordination. Defendant was not staggering or swaying; he was not holding on to anything, and he did not fall. Defendant answered the officers'

3

questions, gave his name as "Dave," told them that his girlfriend lived in apartment No. 6, and that he lived in apartment No. 7. When he was asked whether his girlfriend was still inside, defendant replied, "She should be." Defendant was then placed in handcuffs and led to the officers' patrol car. During the walk, defendant did not lose his balance.

When Detective Sergeant Raul Saldana arrived at the crime scene, he observed Sproson's body lying face down, with her upper torso in the bathroom, her head close to the toilet, and the lower part of her body in the hallway. It appeared that the bullet, fired from 18 inches to two feet away, traveled in a straight line, and entered the back of her head about two inches behind her left ear. The bullet exited her head at the right temple and struck the middle of the underside of the toilet lid, which was up and resting vertically against the toilet tank.

During the booking process Officer Smuts observed that defendant appeared to have perfect coordination, with no stumbling or holding himself against the wall for balance as he stood. Defendant was able to follow the officers' directions, including to turn around. When defendant's blood was drawn later, at approximately 9:20 a.m. the same morning, his blood alcohol content (BAC) was .25 percent. Sergeant Saldana testified that he had dealt with many intoxicated people, perhaps thousands over his 30 or so years as a police officer, and the highest BAC he had encountered was .46 percent. He had handled people with a .25 percent BAC several times and had seen a variety of behavior in individuals with a high BAC. Sergeant Saldana observed defendant during the booking process, and noticed that although defendant's speech was slurred and he appeared to be intoxicated, he made sense and could be understood. Defendant's coordination was good, he was not swaying or stumbling, he seemed pretty steady on his feet, did not lean on anything, and maintained his balance. Defendant was cooperative, and not combative, antagonistic, or belligerent.

Sergeant Saldana assisted Los Angeles County Sheriff's deputies in a search of defendant's studio apartment where they found a nine-millimeter semiautomatic handgun under the mattress and box springs of the bed. A search of defendant's pockets turned up

4

an expended nine-millimeter casing, an unfired nine-millimeter round, a fired "mushroomed" bullet, and some coins.  Sproson's DNA was recovered from the mushroomed bullet and from several bloodstains on defendant's clothing and foot.

**Defense evidence**

Defendant presented the testimony of physician and former police officer, Terence McGee, a specialist in addiction medicine and expert in testing for alcohol and drug abuse.  Dr. McGee estimated that defendant's BAC at 5:00 a.m. was probably .30 percent if his BAC was .25 percent at 9:20 a.m.  He testified that the average person with a .30 percent BAC would be unconscious, and death from respiratory arrest would normally occur at .40 percent; however, a person can develop a tolerance to alcohol over time, and the practiced alcoholic could surpass those levels without the same effects as others.  Nevertheless, a person with a .30 percent BAC, would have impaired judgment, causing him to behave differently from himself in a sober state, and to make bad decisions.

Dr. McGee explained that a heavy drinker who still managed to keep a job, pay rent, and so forth was a "functioning alcoholic"; and whether a functioning alcoholic would have the same level of impaired judgment as someone who rarely drank would depend on the situation and the person, as alcohol affected everyone differently.  Dr. McGee thought it was possible that a person with a BAC of .30 or .33 percent would be able to pick up a bullet from the ground, travel 40 to 50 feet, and then place a gun under a mattress.  However in Dr. McGee's opinion, 80 percent of the population would be comatose at .30 percent, and no one at that level would be rational or normal in any intellectual way.

Dr. McGee viewed a video recording of defendant's booking, which took place between 7:20 and 7:30 a.m. on the day of his arrest.  Dr. McGee estimated that at that time, defendant probably had a BAC of about .27 or .28 percent.  The video showed defendant walking in with officers.  Dr. McGee noticed that defendant's eyes were droopy and blood shot, and he thought that defendant sounded intoxicated; however, although defendant's voice was gravelly, he could not recall any slurring.  As defendant stood with his hands cuffed behind him, he did not sway or lean against a wall to keep

5

himself up, and as officers instructed him to turn around, sit down, and so forth, defendant was able to follow the directions. The fact that defendant's coordination was good indicated that he had been using alcohol for a long period of time and had built some tolerance. There was no question in Dr. McGee's mind that defendant was an alcoholic. Picking up a shell casing and bullet, going back to his own apartment, and placing the gun under the mattress, took coordination and thought, indicating that defendant had a higher tolerance for alcohol than most people.

Defendant testified in his defense that Sproson had been his girlfriend for about two years. He described an incident that occurred during the recent Thanksgiving holiday weekend, which they spent together at Lake Havasu. During an argument, Sproson slapped him on the cheek and then tried to punch him, but he moved out of the way, pushed her onto the bed and left the room. She drove home alone the next day. Defendant testified that this was not the first time she had hit him. After returning home Sproson wrote in her diary that she had been drunk, said mean things, and was being selfish. She regretted the alcoholic she had become, and wanted to change. Defendant testified that after he returned home, she apologized and they continued their relationship.

Defendant testified that he drank daily, and drank excessively on a regular basis, although not during the work day. He started drinking in high school and considered himself an alcoholic. On any given evening he would drink 20 beers, plus a shot of rum for every two or three beers. He described the events of Friday, December 30, 2011: he worked that day, and after work, he bought three or four 30-packs of beer and two large bottles of rum for the New Year's weekend; he arrived home at 3:00 p.m., had his first beer immediately, and drank about 12 more, plus some rum, before he and Sproson walked to a nearby restaurant for dinner at 6:00 or 7:00 p.m.; Sproson also drank both beer and rum before dinner, and they continued to drink after dinner; and they stayed up all night and he did not stop drinking until 4:30 a.m.

Around 3:00 a.m., Sproson went downstairs to her apartment to feed her dog, and returned about two hours later. In the meantime, defendant decided to clean his pistol, as he was planning to go to the shooting range in the next few days. By that time, he had

6

opened the second 30-pack of beer and a second bottle of rum. He sat at the table, took the clip out of the gun, cleaned the gun, sprayed lubricant on the internal parts, placed a round in the chamber, as was his custom, and put the cleaning kit away. Sproson then returned, grabbed the gun's clip from the table, and ran back to her apartment. Defendant got up to follow her, not realizing he still had his gun in his hand.

Defendant testified that as he followed Sproson, he demanded his clip several times and counted down from 10 to one. He also said that he still had one round in the chamber and threatened to shoot her, but he did not mean it. Sproson replied that she did not have his clip and asked "Dave, why are you doing this to me?" He asked her again for the clip and counted down from three to one, but still did not intend to do anything if she failed to hand over the clip. Defendant followed Sproson as she walked toward the bedroom. When he was about two feet behind her, she turned, threw the clip at him, striking his lip, and then spun around to her left. Startled, stunned, and in pain, defendant raised his hand and pulled the trigger, in a motion he described as a reflex. Defendant then kneeled over the fallen Sproson and checked for a pulse. He did not see a wound because her hair was in the way. He did not call 911.

Defendant testified he could not remember anything after that until the two officers approached him as he stood outside Sproson's apartment. He did not remember picking up the casing or the mushroomed bullet, or putting the gun under the mattress. Defendant claimed he did not intend to kill Sproson, did not get his gun in order to kill her, and that he missed her very much.

## DISCUSSION

### I. Defendant's contentions

Defendant contends that the trial court erred by failing to give a jury instruction defining the elements of involuntary manslaughter, such as CALCRIM No. 580, and by failing to give instructions such as CALCRIM No. 625 and 626, regarding voluntary intoxication resulting in unconsciousness. He argues that the court should have given both instructions sua sponte because involuntary manslaughter is a lesser included offense of murder, and because the latter instructions would have provided an

7

understanding of voluntary intoxication as it relates to involuntary manslaughter. Defendant also contends that because the jury sent out an inquiry regarding involuntary manslaughter, the trial court was obligated under section 1138 to give the instructions.[3] Defendant also contends that the absence of these instructions deprived him of due process, and that his trial counsel rendered constitutionally ineffective assistance by failing to request them.

## II. Duty to instruct

Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." This procedure may be waived, expressly or by failure to object. (*People v. McCleod* (1997) 55 Cal.App.4th 1205, 1219-1220.)

A trial court must instruct sua sponte on lesser included offenses that are supported by substantial evidence. (*People v. Licas* (2007) 41 Cal.4th 362, 366.) "Involuntary manslaughter is ordinarily a lesser offense of murder. [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 515.)[4] "[T]he 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely '*any* evidence . . . no matter how

---

[3] The jury submitted the following questions during deliberations: "If the defendant is innocent of murder 1 & murder 2 then are we definitely to charge guilty with voluntary manslaughter; or could he also be innocent of voluntary manslaughter [i.e.] if it was an accident that the gun went off, wouldn't it be involuntary manslaughter?" Defense counsel agreed with the trial court's proposed response: "See instruction number 640 for help completing the verdict forms. Please reread all instructions carefully."

[4] Defendant was convicted of voluntary manslaughter. Involuntary manslaughter is not a lesser included offense of voluntary manslaughter. (*People v. Orr* (1994) 22 Cal.App.4th 780, 784-785.) Voluntary manslaughter is an unlawful killing where malice has been negated by such factors as heat of passion or imperfect self-defense. (*People v. Bryant* (2013) 56 Cal.4th 959, 969; § 192.)

8

weak' [citation], but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664; see also *People v. Breverman* (1998) 19 Cal.4th 142, 154, 162.)

The greater offense charged in this case was murder. Murder is the unlawful killing of a human being with malice aforethought (§ 187), while involuntary manslaughter requires a finding that the defendant acted without malice, "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); *People v. Thomas* (2012) 53 Cal.4th 771, 815.) "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423; § 192, subd. (b).) The trial court's duty to instruct sua sponte extends to involuntary manslaughter based on unconsciousness, so long as there is substantial evidence to support it. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 418-419.)

## III. Involuntary manslaughter due to criminal negligence

Defendant contends that the evidence showed that he fired the gun accidentally, while committing misdemeanor brandishing a firearm.[5]

"[T]here are three types of predicate acts that may underlie involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony. All three acts require the same mens rea of criminal negligence. [Citations.]" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1012.) "[C]riminal negligence [is] unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences. [Citation.]" (*People v. Guillen* (2014) 227

---

[5] Section 417, subdivision (a)(2)(B), provides: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable as [a misdemeanor]."

Cal.App.4th 934, 1027, citing *People v. Penny* (1955) 44 Cal.2d 861, 879.)  Such disregard or indifference is measured objectively, and "merely requires a showing that a reasonable person would have been aware of the risk.  [Citation.]" (*People v. Butler*, *supra*, at pp. 1008-1009, fn. omitted.)

"[A]n accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter.  [Citations.]" (*People v. Thomas*, *supra*, 53 Cal.4th at pp. 813-814.)  Defendant represents that his "testimony presented this precise explanation" by testifying that he shot Sproson accidentally.  We have reviewed the two pages in the reporter's transcript cited by defendant, but nowhere on those two pages is there an express or implied claim of accident.  Furthermore we have found no such testimony anywhere else in the trial transcript.  Defendant testified that he did not intend or plan to kill Sproson, but he did not testify that the gun fired accidentally.  Defense counsel asked defendant what happened after he was struck in the face with the clip.  Defendant replied:  "Um, I was just -- I guess, my reflex I just -- I came up -- it hit so hard, I just -- my hand came up, and I -- I believe, *I pulled the trigger*." (Italics added.)  A defendant's claim of having no intent to kill, by itself, does not require an instruction on involuntary manslaughter, and a gun does not fire by accident when the trigger is intentionally pulled.  (See *People v. Thomas, supra*, at pp. 814-815.)  Thus, an instruction regarding involuntary manslaughter due to accident was unwarranted.

As the trial court was not required to give such an instruction, and because defendant agreed to the court's response to the jury inquiry in that regard, the court did not abuse its discretion in not following the precise procedure of section 1138.**6**  (See *People v. McCleod, supra*, 55 Cal.App.4th at pp. 1219-1220 [error under section 1138 reviewed for abuse of discretion].)

Regardless, if the trial court had erred, any such error would be harmless under any standard of prejudice, as "'the factual question posed by the omitted instruction was

---

**6**      See footnote 3, *ante*.

necessarily resolved adversely to the defendant under other, properly given instructions' [citation]." (*People v. Prettyman* (1996) 14 Cal.4th 248, 276.)  The jury was instructed with CALCRIM Nos. 3146 and 3149 regarding the personal use and the intentional discharge of a firearm.  The jury found that defendant personally and *intentionally* discharged a firearm, causing the victim's death.

## IV.  Unconsciousness due to voluntary intoxication

Defendant contends that the trial court was required to instruct that killing while unconscious due to voluntary intoxication is involuntary manslaughter.  Under section 29.4 (former section 22), voluntary intoxication can negate premeditation, deliberation, express malice, or other required specific intent, but it cannot completely relieve a defendant of criminal liability.  (*People v. Halvorsen, supra*, 42 Cal.4th at pp. 417-418.)  Rather, a killing while unconscious due to voluntary intoxication is treated as involuntary manslaughter.  (*People v. Ochoa, supra*, 19 Cal.4th at p. 423.)

Without citation to authority, defendant suggests that a person is unconscious if he is too intoxicated to harbor a conscious disregard for human life.  On the contrary, voluntary intoxication does not negate a conscious disregard or implied malice. (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1297-1298, 1300.)  As the California Supreme Court has recognized in dictum, "depending on the facts, it now appears that defendant's voluntary intoxication, even to the point of actual unconsciousness, would not prevent his conviction of second degree murder on an implied malice theory."  (*People v. Boyer* (2006) 38 Cal.4th 412, 469, fn. 40; see also *People v. Carlson* (2011) 200 Cal.App.4th 695, 706-707.)  Evidence of "voluntary intoxication is irrelevant to proof of the mental state of implied malice or conscious disregard."  (*People v. Timms, supra*, at p. 1300.)

"Unconscious" in this context does not mean unconscious of the danger to human life, but unconscious or unaware of one's own *actions*.  (*People v. Haley* (2004) 34 Cal.4th 283, 313; see *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1081-1083.)  "[U]nconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.'  [Citation.]"  (*People v. Halvorsen, supra*, 42 Cal.4th at p. 417.)

11

"An unconscious act, as defined 'within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.' [Citations.]" (*People v. Ferguson, supra*, at p. 1083.)

The evidence defendant cites as demonstrating unconsciousness shows only that defendant was undoubtedly quite intoxicated, with a BAC of .30 to .33 percent. Defendant notes that Dr. McGee testified that the average person, and even most long-term drinkers with such high a BAC would have passed out; and he explained that although some long-term drinkers could have sufficient alcohol tolerance to be walking around, such a person would be extremely intoxicated, have impaired judgment, and could act rashly and impulsively. Dr. McGee's opinion did not require an instruction on unconsciousness, as a very intoxicated person is not unconscious simply because he demonstrates extremely bad judgment. (See *People v. Ferguson, supra*, 194 Cal.App.4th at p. 1084.)

Defendant also notes his lack of memory after firing the gun. A "professed inability to recall the event, without more, [is] insufficient to warrant an unconsciousness instruction. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 888.) "[W]hile 'a reviewing court' must 'assume that [the defendant's] selective recollection was natural, not feigned' it is 'far short of a claim or description of . . . coexistent unconsciousness.'" (*People v. Carlson, supra*, 200 Cal.App.4th at p. 704.) Nevertheless, defendant remembered the event well enough to describe it in detail. He did not lose his memory until after he shot Sproson and confirmed she was dead.

Defendant's ability to describe the events in detail amply demonstrated that he was not unconscious during that time. (Cf. *People v. Halvorsen, supra*, 42 Cal.4th at p. 418.) Further, the "complicated and purposive nature of his conduct" prior to the shooting provided substantial evidence of consciousness. (*Ibid*.) Defendant cleaned his gun and put the cleaning kit away, and he was able to describe the steps he took in doing so. Knowing he had a bullet in the chamber of the gun in his hand, defendant used two count-downs and the threat of shooting Sproson to obtain her compliance. Then, after

Sproson threw the magazine and turned her back to him again (and after she kneeled, stumbled, or was pushed downward, as indicated by the trajectory of the bullet), defendant raised the gun and pulled the trigger. He then checked her pulse, picked up the casing and spent bullet, and returned to his own apartment to hide the gun. Defendant's own expert testified that these last actions took coordination and thought, indicating a higher tolerance for alcohol than most people.[7]

Not only did the facts demonstrate defendant's consciousness, they also provided substantial evidence of malice. "Malice is implied . . . when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 596.) Whether the defendant was aware of the danger and acted with a conscious disregard for human life may be inferred from the circumstances and defendant's acts leading up to the killing. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107-108.) In particular, brandishing a loaded weapon during a heated argument, as defendant did here, implies malice. (*Id*. at pp. 108-109.) Other circumstances included defendant's familiarity with the use of his gun, as shown by his sufficient understanding of its parts in order to clean it, his custom of keeping a bullet in the chamber, and his intended shooting-range practice; the physical violence that had erupted in past arguments with Sproson, and his own testimony that Sproson had used force against him on more than one occasion, most recently the month before the shooting; and defendant's act in following Sproson to her apartment with a loaded gun while threatening to shoot her. Further, as the jury found, defendant fired the weapon intentionally. He admitted that he pulled the trigger, albeit

---

[7]     In contrast see *People v. Lee* (1999) 20 Cal.4th 47, 53, 58, where the evidence was sufficient to require an instruction on unconsciousness: the defendant's BAC was estimated to have been between .33 and .39 percent; a witness testified that the defendant appeared different, giving a blank stare as if he were ""possessed by a spirit'"; he was staggering and falling against the wall as he got his gun; the witness heard a shot, came to look, and saw the defendant holding the victim and begging her not to die; the gun was on the floor.

impulsively, and he did not testify that the gun accidentally discharged. We conclude that under such circumstances, no rational jury could conclude that defendant was unconscious or that he did not harbor a conscious disregard for the danger his actions posed to Sproson's life. Thus, instruction on the lesser offense of involuntary manslaughter was unwarranted. (See *People v. DePriest* (2007) 42 Cal.4th 1, 50.)

As involuntary manslaughter instructions were factually and legally unsupported, counsel did not render ineffective assistance by not requesting them. (See *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)

If the trial court had erred in failing to instruct sua sponte on unconsciousness, any such error would not implicate defendant's constitutional right to due process and would thus be reviewed under the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836, which asks whether an examination of the whole record reveals a reasonable probability that the error affected the outcome. (*People v. Breverman, supra*, 19 Cal.4th. at p. 149, 165; Cal. Const., art. VI, § 13.) Under the same evidence and reasoning by which we found that no reasonable jury would find unconsciousness, we conclude that there would be no such probability; and further, we conclude beyond a reasonable doubt that the omission of the instructions did not contribute to the jury's verdicts. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:

_____, P. J.
BOREN

_____, J.
HOFFSTADT


14